KAREN Y. UCHIYAMA, SBN 154414
LAW OFFICES OF KAREN Y. UCHIYAMA
733 Webster Street
San Francisco, California 94117
Tel: (415) 271-3364
Direct: (415) 563-9301
Fax: (415) 563-9304
Email: Karen@uchlegal.com

Attorney for Plaintiffs
XELAN PROP 1, LLC; RENKA PROP, LLC;
NOZARI 2, LLC; ZORIALL, LLC;
VERPRESAR, LLC; CAMIERDA 1, LLC;
JAMBAX 2, LLC, KATOKA 5, LLC;
ANNE KIHAGI

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA – OAKLAND

| | |
|---|---|
| XELAN PROP 1, LLC, , a California Limited Liability Company; RENKA PROP, LLC, a California Limited Liability Company; NOZARI 2, LLC, a California Limited Liability Company; ZORIALL, LLC, a California Limited Liability Company; VERPRESAR, LLC, a California Limited Liability Company; CAMIERDA 1, LLC, a California Limited Liability Company; JAMBAX 2, LLC, a California Limited Liability Company; KATOKA 5, LLC, a California Limited Liability Company; ANNE KIHAGI, an individual, <br><br>　　　　　Plaintiffs, <br><br>　　v. <br><br> CITY & COUNTY OF SAN FRANCISCO; MICHAEL WEISS, an individual, PETER KEITH, an individual, and DOES 1 through 20, inclusive. <br><br>　　　　　Defendants. | Case No. <br><br> **COMPLAINT FOR DAMAGES AND RELIEF FOR:** <br><br> 1) **VIOLATIONS OF EQUAL PROTECTIONS, 42 U.S.C. §1983;** <br><br> 2) **VIOLATIONS OF SUBSTANTIVE DUE PROCESS, 42 U.S.C. §1983;** <br><br> 3) **VIOLATIONS OF FIRST AMENDMENT RIGHTS TO PETITION, 42 U.S.C. §1983;** <br><br> 4) **VIOLATIONS OF 42 U.S.C. §1985 CONSPIRACY AND ABUSE BY PUBLIC OFFICIALS FOR ILLEGAL GOVERNMENT TAKING OF PRIVATE REAL PROPERTY** <br><br> 5) **ILLEGAL SEARCHES OF PRIVATE REAL PROPERTY WITHOUT PROBABLE CAUSE IN VIOLATION OF 4th** |

- 1 -

AMENDMENT;

6) **ILLEGAL GOVERNMENT TAKING OF PRIVATE REAL PROPERTY WITH JUST COMPENSATION IN VIOLATION OF FIFTH AMENDMENT;**

7) **FOR RACIAL DISCRIMINATION AND DENIAL OF GOVERNMENT SOCIAL SERVICES;**

8) **FRAUD UPON THE COURT AND BOARD OF SUPERVISORS BY GOVERNMENT ADVISORS/ PROSECUTORS;**

9) **MISAPPROPRIATION AND MISDIRECTION OF RECEIVERSHIP FUNDS;**

10) **PROFESSIONAL NEGLIGENCE;**

11) **NEGLIGENCE PER SE;**

12) **FOR EXCESSIVE FINES IN VIOLATION OF 8TH AMENDMENT**

13) **RESTITUTION OF FEES; AND INJUNCTION FOR UNFAIR BUSINESS PRACTICES; VIOLATION OF BUSINESS & PROFESSIONS CODE §17200, et seq., §17500 et seq.**

14) **WRONGFUL SALES OF REAL PROPERTY VIA COLLUSION BY ILL-APPOINTED RECEIVER AND SECURED LENDERS;**

15) **DECLARATORY RELIEF**

16) **FOR DECREE SETTING ASIDE C.C.S.F. JUDGMENT FOR BEING VOID FOR LACK OF JURISDICTION, DENIAL OF A FAIR TRIAL, FOR VIOLATIONS OF PROFESSIONAL RULES OF RESPONSIBILITY 3.3, AND FRAUD UPON THE COURT**

COMPLAINT FOR DAMAGES AND OTHER RELIEF

**DEMAND FOR JURY TRIAL**

Plaintiffs XELAN PROP 1, LLC, RENKA PROP, LLC, NOZARI 2, LLC, ZORIALL LLC, VERPRESAR LLC, CAMIERDA 1, LLC, JAMBAX 2, LLC, KATOKA 5, LLC, and ANNE KIHAGI (collectively "Plaintiffs") hereby alleges as follows:

## PARTIES, JURISDICTION AND VENUE

1. This Court has subject matter jurisdiction over this action under 28 U.S.C. §§1331 and 1343 and 42 U.S.C. §1983.

2. Venue is proper in the United States District Court for the Northern District of California as all acts complained of occurred within this District.

3. Plaintiff ANNE KIHAGI, an African-American/British woman, is the managing member of the following limited liability companies which own and manage real properties in San Francisco.

4. Plaintiff XELAN PROP 1, LLC ("XELAN") was and at all relevant times hereto is a limited liability company which owned small apartment buildings in San Francisco at 1000-1022 Filbert Street, 4018-4022 19th Street, and 3947 18th Street.

5. Plaintiff RENKA PROP, LLC ("RENKA") was and at all relevant times hereto is a limited liability company which owned a small apartment building in San Francisco at 195 Eureka Street and 1135-1139 Guerrero Street.

COMPLAINT FOR DAMAGES AND OTHER RELIEF

6.      Plaintiff NOZARI 2, LLC ("NOZARI") was and at all relevant times hereto is a limited liability company which owned a small apartment building in San Francisco at 650 Church Street.

7.      Plaintiff ZORIALL, LLC ("ZORIALL") was and at all relevant times hereto is a limited liability company which owned a small apartment building in San Francisco at 69-75 Hill Street.

8.      Plaintiff VERPRESAR LLC ("VERPRESAR") was and at all relevant times hereto is a limited liability company which owned a small apartment building in San Francisco at 1901 Pacific Avenue.

9.      Plaintiff CAMIERDA 1, LLC ("CAMIERDA") was and at all relevant times hereto is a limited liability company which owned a small apartment building in San Francisco at 1012 Page Street.

10.     Plaintiff JAMBAX 2, LLC ("JAMBAX") was and at all relevant times hereto is a limited liability company which owned a small apartment building at

11.     Plaintiff KATOKA 5, LLC ("KATOKA") was and at all relevant times hereto is a limited liability company which owned a small apartment building in San Francisco at 3330 26th Street.

12.     Defendant City & County of San Francisco ("CCSF"), is a public facilities corporation organized and existing pursuant to the laws of the State of California.  It is self-insured and responsible for the acts of its agents and employees, and is responsible for its departments that are given duties under the City Charter, including the San Francisco City Attorneys Office and the departments therein, and the San Francisco Building Inspection & Planning Department ("DBI").  All of the wrongful acts complained of herein were authorized by CCSF and carried out in furtherance of its unlawful policies.

13.     Defendant MICHAEL WEISS is a deputy city attorney who works in the Code Enforcement Department of San Francisco City Attorneys Office.  He is an individual employed by CCSF and whose actions were taken under color of law as part of his government work as a city prosecutor and also as counsel to DBI.

14.     Defendant PETER KEITH is a deputy city attorney who works in the Code Enforcement Department of San Francisco City Attorneys Office.  He is a government prosecutor and also acts as counsel to DBI.  He is an individual employed by CCSF and whose actions were taken under color of law as part of his government work as a city prosecutor and also as counsel to DBI.

15.     The true names, identities and capacities of these defendants designated as DOES 1 through 20, inclusive, and each of them, are unknown to Plaintiffs at this time, who therefore sue said defendants by such fictitiously designated names, and will amend the Complaint to allege their true names and capacities when said defendants are ascertained.  Plaintiffs are informed and believe, and thereon allege, that each of said fictitiously named defendants is responsible for the occurrences herein alleged, and that Plaintiffs' injuries, as herein alleged, or approximately caused by said Defendants.

16.     Plaintiffs are informed and believe and, on the basis, thereof allege Defendants, and each of them were responsible for damages incurred by Plaintiffs as described herein.  Plaintiffs are further informed and believe and thereon allege that, at all times herein mentioned, each of the Defendants sued herein was the agent, civil joint conspirator, or employee of each of the remaining Defendants and was at all times acting within the purpose and scope of such agency, civil conspiracy, and employment.  Plaintiffs are further informed and believe and thereon allege that, at all times herein mentioned, each of the Defendants aided and abetted the remaining Defendants in the acts alleged herein.

## INTRODUCTION

17.     Plaintiffs hereby allege and incorporate herein by reference, the foregoing paragraphs 1 through 16 as if the same were fully set forth at length herein.

18.     At all pertinent times, Plaintiffs XELAN, RENKA, NOZARI, ZORIALL, VERPRESAR, CAMIERDA, JAMBAX and KATOKA owned small apartment buildings in San Francisco, California.  Plaintiff ANNE KIHAGI managed the rental property and had a profitable rental housing business.  She personally oversaw renovations of the apartments, interfaced with DBI regarding her building permits, and sought to keep attractive buildings.  Plaintiffs were capable for paying its loan obligations, property taxes, LLC fees, insurance and operating expenses with the Rents generated from their 11 buildings.

19.     Plaintiff ANNE KIHAGI is an educated Black businesswoman from London with a business degree from and an M.B.A. from two top universities in the United States.  KIHAGI is one was the few African-American/British landlords who operate rental housing businesses in San

Francisco.  Yet, at all times herein described, Plaintiff KIHAGI was treated like an uneducated Black slave as she was lynched by an invisible rope held by Defendants WEISS and KEITH under the color of their positions as city attorneys.

20.     By May 2022, as a result of continuous fraud upon the Superior Court and wrongdoing by Defendants, six of Plaintiffs' properties had been sold off by a court appointed receiver, over their objections, when there was no legal basis for the receivership, and no legal basis for the receiver sales without judgments or decrees of judicial foreclosure.

## GENERAL ALLEGATIONS

21.     In May 2015, Plaintiff KIHAGI became engaged in a political dispute with the City & County of San Francisco ("CCSF") whereby she confronted the Code Enforcement Department of the City Attorney's Office and accused them and the Department of Building Inspection (DBI) of wrongdoing and discrimination against her, a Black female landlord.  A certain deputy city attorney, Defendant MICHAEL WEISS (hereafter "Defendant WEISS"), had instructed the DBI to not issue building permits to Plaintiff KIHAGI without his approval because she was actively gentrifying buildings in the Mission and Castro neighborhoods, and evicting certain tenants [through unlawful detainer proceedings for just cause] and after renovating old apartments, KIHAGI was replacing them with market rate tenants.

22.     After disgruntled tenants complained to Defendant WEISS at City Attorneys' Code Enforcement Department about KIHAGI's [litigation privileged] activities, Defendant WEISS proceeded to abuse his position as 1)  a government prosecutor and 2)  an advisor to the DBI (dual roles) to conduct illegal inspections of KIHAGI's LLCs' properties, without probable cause. Defendant WEISS instructed DBI inspectors to comb Plaintiffs' properties for any and all possible building code violations.  After all, KIHAGI appeared to be a successful Black landlord making money by renovating her apartments and renting them out for market rents.  Defendant WEISS wanted to enjoin her from doing what most Caucasian landlords strive for.

23.     Defendants wrote to Plaintiffs' tenants and asked them to consent to CCSF's inspections of the interiors of their apartments.

24.     Plaintiff KIHAGI vehemently withheld her consent to Defendant WEISS' *top-to-bottom* inspections of her LLCs' properties and inside their tenants' units.  Nonetheless, Weiss collaborated with angry tenants and tenant activists groups and collaborated with them to create "tenant unions" within some of Plaintiffs' apartment buildings to try and find building code violations inside the vintage, Victorian and Edwardian buildings.

25.     On March 5, 2015, Defendants WEISS and KEITH created a "Task Force" composed of building inspectors and two police officers to inspect all of Plaintiffs' properties, without probable cause.  They had no inspection warrant and they trespassed into the common areas of Plaintiffs' properties in search of building code violations for DBI to prosecute.  In order to cooperate with CCSF, certain tenants consented to the Task Force inspections

26.     On May 18, 2015, after Plaintiff KIHAGI filed a complaint Federal Court against CCSF and Defendant WEISS on various Constitutional grounds (15-CV-01168-KAW).  She later dismissed her complaint, without prejudice, after becoming financially and emotionally ***overwhelmed*** by Defendant WEISS' retaliatory conduct that followed:

27.     Seventeen (17) days later, on June 6, 2015, Defendant WEISS, as a CCSF deputy city attorney (on behalf of "the City & County of San Francisco and the People of the State of California") brought a retaliatory lawsuit against Plaintiff KIHAGI and her two sisters, Christine and Julia Mwangi (who had implemental lawful Owner Move-In evictions in three different buildings owned by Plaintiffs XELAN, ZORIALL and RENKA), and against four limited liability companies (hereafter referred to as "the KIHAGI Defendants"), including Plaintiffs XELAN, RENKA, NOZARI, and ZORIALL.

28.     The CCSF lawsuit (CGC-15-546152) made mountains out of molehills.  The CCSF Complaint alleged that the KIHAGI Defendants ***harassed*** their tenants and served House Rules; DCA Weiss sought an injunction to stop their management style.  The CCSF Complaint also prosecuted the KIHAGI Defendants at the Superior Court level for having building code violations even though the DBI was ***simultaneously*** processing the same alleged building code violations through its regular administrative proceedings.  CCSF sought a permanent injunction to enjoin the KIHAGI Defendants from managing their rental properties and from evicting tenants for just cause.

29.     The single assignment judge (Hon. Richard B. Ulmer) **denied** CCSF's motion for a preliminary injunction against the KIHAGI Defendants in February 2016 noting that CCSF's lawsuit was weak because DCA Weiss had admitted in his moving papers that: 1)  most of the building code violations had been abated at DBI before the lawsuit was filed, and 2)  the disgruntled tenants (witnesses) no longer lived in the subject buildings.  Judge Ulmer noted that terms of CCSF's proposed injunction were so draconian and "unprecedented," they could **"drive a landlord out of business."**

30.     Nonetheless, Defendants proceeded to disqualify Judge Ulmer, and instead opted for another single assignment judge, Angela Bradstreet.  Meanwhile, the disgruntled tenants and tenant activists also harassed Plaintiff KIHAGI and her sisters at their homes, and distributed ugly flyers (with photos of their faces) around San Francisco ridiculing the successful Black landlord for evicting tenants for profit.  Defendant CCSF also released dozens of press releases describing and picturing dark-skinned, African-American/British KIHAGI as "the worst landlord in San Francisco" as if she targets vulnerable low-income and homosexual tenants for eviction, and harasses them out of their rent-controlled apartments (of which there was not a shred of evidence) out of greed.

31.     After the failed hearing before Judge Ulmer, Defendant WEISS changed his strategy in order to influence the new single assignment judge.  Defendant WEISS and three other deputy city attorneys (in the Code Enforcement Department) orchestrated these press releases with the intent of prejudicing the new single assignment Judge Bradstreet (who happens to be liberal and openly gay) and the jury pool against the KIHAGI Defendants before the trial.

32.     It worked.  Defendant WEISS and his supervising attorney, Defendant PETER KEITH, are both openly gay men.  Their press releases interviewed disgruntled, homosexual tenants who rallied and protested in the gay Castro neighborhood and complained about KIHAGI annoying and evicting them to house her sisters.  Judge Bradstreet read over 20 news articles comprising the media's crucifixion of KIHAGI by gay tenants, disgruntled evicted tenants, and exaggerated allegations.  Nonetheless, Judge Bradstreet did not disqualify herself[1] when she *knew* she had a conflict of interest.  A secret emotional one.

---

[1] After the trial and judgment was entered, Plaintiffs discovered that Judge Bradstreet had pioneered legislation where judges who were ever involved with the Boy Scouts of America are obliged to recuse themselves in cases where the litigants are gay (because of the Boy Scouts' homophobic agenda presumes bias).  Yet, Judge Bradstreet accepted the gay deputy city attorneys' concerted depiction of KIHAGI as a hater of gay people before the court trial commenced, and she did not

33.     Plaintiffs hereby allege that as a result of Defendants' litigation tactics, they were denied their Constitutional rights to a fair trial.

34.     After reading the defamatory press releases attached to KIHAGI's motion to transfer venue to a neutral county on the grounds that the KIHAGI Defendants were "friendless in San Francisco," the new single assignment Judge Bradstreet **denied** KIHAGI's motion.  She commented that a jury pool would certainly be prejudiced by reading the press releases, but would not.  Later, she denied the KIHAGI Defendants a jury trial.

35.      Judge Bradstreet also <u>denied KIHAGI **and her sisters'**</u> rights to testify at the trial in their own defense, ***as a discovery sanction against KIHAGI***[2].

36.     She also denied KIHAGI's defense attorneys' motion for a trial continuance to complete discovery after Defendant CCSF had <u>expedited</u> the trial date to gain advantage of KIHAGI's new defense firm's lack of preparation.

37.     Worst of all, Judge Bradstreet deemed all **abated** building code violations as "still uncured" (in the same discovery sanction), so at the court trial she could award hundreds of thousands of dollars of civil penalties to CCSF.  During the trial, Judge Bradstreet also barred the KIHAGI Defendants' contractors from testifying about the abated code violations.

38.     Judge Bradstreet also ***deemed*** the KIHAGI Defendants financial worth to be $25 million after their attorneys made objections on grounds of financial privilege because no punitive damages were warranted under the CCSF Complaint.

39.     After an awkward, one-sided court trial, on May 23, 2017, Judge Angela Bradstreet awarded over $5 million to CCSF and its attorneys fees, and she issued a "Permanent Injunction After Trial" ("the CCSF Injunction") against the KIHAGI Defendants whereby KIHAGI would be enjoined **for five years** from managing her LLCs' rental properties, or contacting any of their tenants.  Nor could the KIHAGI Defendants commence any litigation against their tenants, or serve notices or eviction notices on tenants (or other "litigation privileged" conduct under Civil Code §45) without

---

recuse herself.  After Plaintiffs raised her judicial misconduct to the Court after their properties were unlawfully sold, Judge Angela Bradstreet retired in January 2022.

[2] Defendant WEISS brought a terminating sanction against KIHAGI based on her dissatisfactory deposition responses instead of bringing a regular motion to compel further responses.

prior written authorization of and supervision of a so-called "Independent [Property] Manager," or its legal representative.

40.     Judge Bradstreet's Injunction expressly stated that violations of the Injunction constitute contempt of court.

41.     The CCSF Injunction provided that the Independent Manager must be approved by the prosecuting deputy city attorneys (Defendant WEISS), and would be "responsible for the day-to-day management of the properties, including maintenance, remodeling and construction work and shall facilitate all applicable inspections" **post-trial, for five years.**

42.     CCSF's proposed and insisted upon the "Independent Manager" being the property management company of its choice, Vanguard.

43.     After entry of judgment on May 23, 2017, the KIHAGI Defendants naturally appealed Judge Bradstreet's judgment in its entirety.   During the period of May 23, 2017 to February 2018, KIHAGI struggled to refinance her LLCs' properties to pay for an $8 million appeal bond to stop CCSF's aggressive efforts to collect on Bradstreet's money judgment.

44.     Out of caution, the KIHAGI Defendants decided to use an independent property manager called "Property Management San Francisco" (PMSF) during their appeal in the hopes that CCSF would stop harassing them with unannounced inspections of their properties by DBI Inspectors and disruptions of their rental housing businesses.

45.     The deputy city attorneys unreasonably withheld their consent to PMSF as the Independent Property Manager, and Plaintiff KIHAGI refused to use Vanguard when it became apparent that Vanguard was not at all "independent" of the City's influence and instruction.  Defendant WEISS clearly intended to use Vanguard and the CCSF Injunction to somehow <u>control</u> the KIHAGI Defendants' properties and business for the next five years.

## THE POST-JUDGMENT RECEIVER TWO YEARS LATER

46.     Judge Bradstreet's 154 page Statement of Decision was carefully written to withstand any appeal.  The KIHAGI Defendants' $8 million appeal bond paid off the money judgment in mid-2019, but they were still subject to the five-year Injunction awarded to CCSF.

COMPLAINT FOR DAMAGES AND OTHER RELIEF

47.     Defendants WEISS and KEITH still would not leave Plaintiff KIHAGI alone.  The following abuses by government officials against its citizens constitute violations of 42 U.S.C §§1983 and 1985:

48.     After judgment was entered in its favor, Defendant CCSF continued to make unannounced inspections of Plaintiffs' properties without probable cause.  If the DBI found more building code violations after the court trial, DBI still prosecuted Plaintiffs through its administrative proceedings accordingly, but Defendants WEISS and KEITH reported them to the Court as "violations of the (*in personam*) Injunction."

49.     After the remittitur was issued in March 2019, Defendant CCSF brought a motion[3] for the appointment of a receiver for no lawful purpose under Code of Civil Procedure Section 564 or the Injunction.  Defendant WEISS' moving papers stated the City needed to "punish" KIHAGI for managing her LLCs' properties with a property manager not approved by CCSF and because DBI had found more building code violations after the trial.  He also depicted KIHAGI as a slumlord who lost million$$ in the CCSF lawsuit.

50.     Defendant WEISS sought the "in rem" remedy of a receiver under the guise he was only going to act as the "Independent Property Manager" under the terms of the CCSF Injunction.  By willfully and deliberately mispresenting the law on receiverships to the Court, Defendant WEISS fraudulently subverted the integrity of the judicial process after July 29, 2019.  The resulting scheme (Defendant CCSF's abuses of Plaintiff through its court-appointed receiver) caused substantial injuries to Plaintiffs and to the integrity of the Court after Defendants' receiver was appointed.  Clearly, in reliance upon these government attorneys' fraud upon the Court, Judge Haines appointed an "in rem" receiver to take possession of Plaintiffs' properties, rents and assets.

51.     On July 29, 2019, Defendants WEISS and KEITH also added nonparties to be subject to the CCSF Injunction knowingly without any legal authority.  Plaintiffs VERPRESAR, CAMIERDA,

---

[3] Defendant Weiss strategically did not bring the motion to Judge Bradstreet because she had required a contempt proceeding.  She had previously denied CCSF's post-trial contempt proceeding against the KIHAGI Defendants and ordered CCSF to "meet & confer" to avoid future contempt proceedings.  Defendant Weiss instead brought the motion to Judge Charles F. Haines to circumvent contempt proceedings and get a receiver appointed.

1    JAMBAX and KATOKA were not named defendants in the CCSF Complaint or judgment debtors.

2    Nor were they agents for any of the KIHAGI Defendants.  The CCSF and its receiver had no legal

3    authority to take possession, custody and control of the properties, rents and assets of Plaintiffs

4    VERPRESAR, CAMIERDA, JAMBAX and KATOKA

5        52.    Defendants WEISS and KEITH also proposed to the Court that $53,000 (each) of more

6    civil penalties be charged against **nonparties and non-judgment debtors** VERPRESAR,

7    CAMIERDA, JAMBAX and KATOKA (each) for *KIHAGI's* alleged violations of the CCSF Injunction

8    (for not agreeing to use CCSF's choice – Vanguard, as the Independent Property Manager).

9        53.    On July 29, 2019 (two years after the Bradstreet trial and after the CCSF money

10   judgment was paid off by Plaintiffs), San Francisco Superior Court Judge Charles F. Haines[4] granted

11   CCSF's unprecedented "five-in-one" motion that was presented to him by Defendant WEISS, <u>without

12   contempt proceedings that are required by statute and for no statutory grounds for a receiver under

13   C.C.P. §564.</u>

14       54.    Defendant WEISS's willful and deliberate circumvention of contempt proceedings, and

15   his bringing a "five-in-one" motion to an inexperienced judge containing false, exaggerated, and

16   misleading facts in order to get an unlawful, post-judgment receiver appointed to enforce a five-year *in

17   personam* Injunction without contempt proceedings, and to get a post-judgment receiver to further

18   harass, financially abuse, and punish the KIHAGI Defendants after the court trial was over.  Only the

19   CCSF Injunction was in effect.

20       55.    The Order of July 29, 2019, in effect, unlawfully ***modified*** Judge Bradstreet's final

21   judgment of May 23, 2017, as follows:  The Order added new LLCs to the Injunction, awarded an

22   additional $434,000 of civil penalties against the KIHAGI Defendants, over $45,000 of attorneys fees

23   for CCSF's collection efforts, <u>and the appointment of a receiver to act as the "Independent Manager"

24   under the CCSF Injunction.</u>

25       56.    Even though the underlying action (tried two years before) was not an "in rem"

26   proceeding regarding the disposition of any property, the July 29, 2019 Order appointed a receiver (an

27   _____

28   [4] Judge Charles F. Haines was newly appointed to the Law & Motion department at San Francisco Superior Court in early 2019.

"in rem" remedy) to take possession of the KIHAGI Defendants' and four **nonparty** LLCs' properties, rents and assets, and prohibited them from interfering with the receiver, accessing their properties, encumbering their properties, or controlling their money until the Injunction expired on May 22, 2022.

57.    Plaintiffs VERPRESAR, CAMIERDA, JAMBAX and KATOKA had never been named in the CCSF Complaint, or served with the summons and complaint, or contempt papers.  None of them is or ever was the agent for any of the KIHAGI Defendants.  None of them was a judgment debtor to the CCSF Judgment or Injunction.

58.    Plaintiffs allege that Defendants used a receiver from Los Angeles who had exhibited weak moral and ethical character earlier in 2019 (discussion of this receiver is discussed below). Defendant CCSF deliberately committed gross fraud upon the Court to further their fraudulent scheme of installing a receiver under the guise of a "independent property manager" under Bradstreet's Injunction.  There exists no legal authority for a receiver to manage and preserve citizens' real properties after a money judgment has been paid or to prevent violations of an injunction or as "punishment" for violations of an injunction.

59.    Defendants' WEISS and KEITH, and the receiver they chose to conspire with (hereafter referred to as "Defendants' Receiver" or "the CCSF Receiver") collectively committed intentional fraud upon the Court by misrepresenting the law on receiverships, enforcement of injunctions, and the material facts against the KIHAGI Defendants that resulted in the post-judgment, "in rem" remedy of a receiver.  Defendants convinced the Court by taking statements of law out of context, and assured Judge Haines he had "broad authority" to appoint a receiver for any purpose after a judgment "to carry the judgment into effect.[5]"  At all times, Defendants conspired with a rogue receiver to take possession of Plaintiffs' eleven (11) properties, rents and assets for no purpose stated in the CCSF Judgment.

60.    As a result of Defendants' intentional fraud upon the Court, Plaintiffs allege that:  1)  the Court lacked jurisdiction to appoint a receiver after entry of the CCSF Judgment under C.C.P. §564 when there was no money judgment to collect; receivers do not enforce injunctions; 2)  the Court

---

[55] Ordinarily, "carrying the judgment into effect" means collecting an unpaid judgment where the judgment creditor has exhausted his efforts to collect the judgment due to obstruction by the judgment debtor; or to abate a public nuisance; or to effect the disposition of property in accordance with the judgment.

lacked jurisdiction to modify a final judgment after trial and after the appeal (C.C.P. 1049); and 3) alleged violations of the Injunction could only be enforced by statutory **contempt** proceedings per the express language of the Injunction and by statute, **not** by the appointment of a receiver as punishment, and not by adding more nonparty LLCs to the Injunction who were never served with CCSF's summons and complaint, or any contempt papers.

61.     Nonetheless, Plaintiffs VERPRESAR, CAMIERDA, JAMBAX and KATOKA's properties, rents and assets were immediately seized by Defendants' receiver on July 29, 2019.  The CCSF Receiver is Kevin Singer of Receivership Specialists, Inc. of Los Angeles.

62.     Under the express terms of the CCSF Injunction, the "Independent Manager" was to manage and preserve the KIHAGI Defendants' seven, not 11 rental properties.  Accordingly, the CCSF Receiver was to act as the Independent Manager, an agent for the principals (the beneficiaries of the receivership estate (Plaintiffs).

63.     At no time was the CCSF Receiver appointed to act like a prejudgment general equity receiver to dissolve or to liquidate Plaintiffs' businesses.  Nor was Defendants' Receiver appointed as a prejudgment nuisance abatement receiver.  Nor was the CCSF Receiver appointed to preserve risky or endangered properties during the pendency of any foreclosure proceedings under C.C.P. §564.

64.     Plaintiffs allege that receiver that Defendants installed by fraud upon the Court never acted as a neutral officer of the Court, and at all pertinent times, the CCSF Receiver conspired with Defendants and others to destroy Plaintiffs' rental housing business in the Receiver's possession and control, and to find ways to liquidate their properties by approval of the Court.  Defendants and the CCSF Receiver acted outside of the spirit and intent of the Injunction.  Judge Bradstreet's Judgment After Trial enjoined Plaintiffs from managing their properties without a property management company for five years.  The CCSF Judgment and Injunction did not appoint a receiver to take possession and control of Plaintiffs' or nonparties' properties, rents and assets.  Defendants went too far.

65.     According to the CCSF Judgment and Injunction, the "Independent Manager" had no duties other than property management.  A property manager is an agent for the principal.  Here, Plaintiffs were the principals and, once Defendants' Receiver was appointed over their objections,

Plaintiffs became the beneficiaries of the receivership estate, and Defendants' Receiver was a fiduciary with all attendant duties.

66.     During the following three years after his appointment, Defendant CCSF Receiver violated his fiduciary duties as a court-appointed receiver (C.R.C. 3.1179) in the worse ways imaginable.   All efforts by Plaintiffs to petition the same court for relief from the receivership were denied as the Court had relied upon Defendants' presentation of legal arguments and their statements of facts in prior pleadings.

67.     Under C.R.C. 3.1179, a court appointed receiver is required to be a **neutral officer of the court** and is prohibited from entering into any "arrangements" or "agreements" with others regarding the administration of the receivership estate.  Defendants WEISS and KEITH are also officers of the court and subject to the Professional Rules of Responsibility (Rule 3.3) regarding candor toward the court and against deliberately misleading the court with false statements of facts and law).  Moreover, the CCSF Receiver was expressly ordered by the Court to make decisions "to benefit the receivership estate" and the Court even authorized him to hire special counsel for such legal advice.

68.     Defendants' Receiver did not hire special counsel to advise him on managing rent-controlled investment properties in San Francisco or the tasks required of him per the Order of Appointment.  Instead, he hired his attorney who only had expertise in liquidating receivership properties.

69.     After his appointment, Defendants' Receiver hired their choice -- Vanguard -- as the property management company to assist him, and they paid themselves and their attorneys handsomely from the receivership funds.  Since his installment by Defendants, the CCSF Receiver and his attorneys unlawfully allowed themselves to be completely influenced and controlled by Defendants WEISS and KEITH, and three sets of secured lenders (described below) to find ways to liquidate Plaintiffs' assets over their objections.

70.      In short, once in the possession and control of Plaintiffs' 11 rental properties and all of the rents and assets of the KIHAGI Defendants and four other LLC's properties, Defendants and their rogue receiver and his self-serving special counsel, Blake C. Alsbrook, Esq. indirectly set out to **liquidate them (per Defendants' political agenda), not to preserve them or manage them to keep**

**them profitable, or do what was in Plaintiffs' best business interests.**  Together, Defendants and their Receiver put their own respective political and financial interests ahead of Plaintiffs, who were the beneficiaries of the receivership estate.

71.     Plaintiffs allege that Defendants' Receiver and his attorney had no experience in operating a business of renting and managing investment properties subject to the San Francisco Rent Ordinance, real property laws on foreclosure, financing real property or secured transactions.  Yet, they were directed by Defendants to destroy KIHAGI's rental housing business and sell off Plaintiffs' properties before the Injunction expired.

72.     At the direction of Defendants (and for their own financial gain), the CCSF Receiver and his attorney entered into prohibited arrangements and agreements with Defendants, attorneys for tenants, and the attorneys for three sets of secured lenders who collectively, and at different times during the receivership(s) to default on Plaintiffs' mortgages and use Defendants' receiver to sell the receivership properties himself.  In order to obtain approval by the Court, the conspirators collectively and deliberately committed willful and deliberate acts of fraud upon the Court regarding the applicable laws and material facts pertaining to administering the receivership estate.

73.     The Court relied upon their legal arguments because their Color of Office, and because they deliberately filed joinders to each other's motions (for Defendants' Receiver to sell Plaintiffs' properties in his possession), and they joined <u>in opposition</u> to Plaintiffs' pleadings; and they supported each other (against KIHAGI) at the hearings.

74.     Plaintiffs (nonparties to the CCSF Action) VERPRESAR, CAMIERDA, JAMBAX and KATOKA should not have been subject to the CCSF Injunction, and their properties and assets never should have been taken into possession of the CCSF Receiver after judgment.

75.     Nonetheless, described in detail below, during the receivership[6] Defendants wrongfully conspired, colluded with, and directed their CCSF Receiver and his attorney to spend Plaintiffs' money and find seemingly lawful ways to liquidate the properties in the receivership estate.  Per Defendants'

---

[6] The CCSF Injunction expired on May 22, 2022, and the Court refused to extend it.  The receivership should be officially terminated on or about August 2, 2022 after the Court ordered the CCSF Receiver to file his Final Report and Account on June 20, 2022.

encouragement and direction, the CCSF Receiver and his attorney Alsbrook wrongfully colluded with three sets of secured lenders, including Umpqua Bank, J.P. Morgan Chase, and hard money lenders who will be referred to herein as "the Liu Lenders," to effect the forced sales of Plaintiffs' properties. Defendants' Receiver would misappropriate and misdirect Plaintiffs' money toward their opponents, default on Plaintiffs' mortgages, refuse to pay Plaintiffs' operating expenses and property taxes (***over the objections of Plaintiffs/the property owners*** who were supposed to be Kevin Singer's principals under agency law, and ***the beneficiaries of the receivership estate.***

**HOW SECURED LENDER UMPQUA BANK AND THE SAME RECEIVER COMMITTED FRAUD UPON THE COURT TO ENFORCE SECURED DEBTS BY A RECEIVER SALE SO THE LENDER COULD AVOID HAVING TO COMPLY WITH FORECLOSURE STATUTES THAT PROTECT BORROWERS FROM OVERREACHING LENDERS:**

76.     Despite the fact that a receiver is a fiduciary with express duties set forth in C.R.C. 3.1179, prior to becoming Defendants' receiver, the same receiver Kevin Singer or Receivership Specialists, Inc. and his attorney Alsbrook colluded with the attorney for secured lender, Umpqua Bank.

77.     From 2005 to 2018, Plaintiff KIHAGI had an unblemished relationship with Umpqua Bank and its predecessor-in-interest, Sterling Bank.  The Bank made over 10 secured loans to Plaintiff KIHAGI, and electronically withdrew its mortgage payments (ACH) from KIHAGI's LLC bank accounts each month on the 10th day.  Since her loans performed perfectly, the Bank never sought annual financial reports, rent rolls or tax schedules from its borrower in accordance with the black letter of the Loan Documents.

78.     On October 26, 2017, in the above-described <u>CCSF v. Kihagi et al</u> action (CGC-15-546152) Judge Bradstreet entered her $5.2 million judgment against the KIHAGI Defendants, including civil penalties for building code violations and unfair business practices, and attorneys' fees (the "CCSF Money Judgment"), and the aforementioned five year Injunction

79.     While the KIHAGI Defendants were arranging an $8 million appeal bond, Defendant WEISS and Defendant KEITHbegan aggressive collection actions to collect the CCSF Money Judgment.

80.     On December 26, 2017, the Court granted CCSF's motion for assignment order of rights, restraining order and turnover order with respect to all Rents which were owed by tenants to the KIHAGI Defendants to satisfy the CCSF Money Judgment.  ("Assignment Order").

81.     Judgment Creditor CCSF tried to execute all the Rents of the KIHAGI Defendants' rental properties by contacting their tenants.  Since Umpqua Bank had a first position, priority lien and assignment of rents provision under its Loan Documents, the Bank decided to intervene into the CCSF lawsuit to bring a simple motion seeking the Court's declaration that the Bank had a first priority lien and perfected security interest in the Rents of the Subject Properties.

82.     At all times, Umpqua Bank continued to collect Plaintiffs XELAN's and RENKA's mortgage payments via automatic withdrawals.  **At no time were Plaintiffs XELAN or RENKA ever in a nonpayment default on Umpqua Bank's loans.**

83.     Nonetheless, Umpqua Bank's attorney, Robert B. Kaplan, saw how San Francisco Superior Court displayed great hostility toward CCSF's Political Foe, Plaintiff KIHAGI (as a result of Defendants WEISS and KEITH's ridicule of her), and saw an opportunity to create unnecessary litigation under Umpqua Bank's deeds of trust to earn attorney's fees from its borrowers.  Foreclosure proceedings severely <u>limit</u> attorneys fees that can charged to borrows in default.

84.     On January 26, 2018, at the advice of Mr. Kaplan, Umpqua Bank's Vice President & Special Assets Officer, Beverly Tengco, notified its borrowers Plaintiffs KIHAGI, XELAN, and RENKA that the Bank was declaring an "Optional Default" under XELAN's Filbert Property Loan Documents, the 19th Street Loan Documents, and RENKA's Eureka Property Loan Documents <u>because of CCSF's Assignment Order</u> (hereafter "Optional Default #1").  Ms. Tengco also noted (for the first time in its lending relation with KIHAGI) that the Borrowers had failed to provide annual financial reports to the Bank from 2014 to 2017 per Sterling Bank's deed of trust ("Optional Default #2").  Umpqua Bank demanded that the Borrowers "take the necessary steps to cure the breaches of the Loan Documents, or the Bank would declare additional defaults under the Loan Documents.

85.     At all pertinent times, Plaintiffs XELAN and RENKA were current on their mortgage payments to Umpqua Bank.  And Umpqua Bank <u>knew</u> that its borrowers were arranging for an appeal

1    bond to stay CCSF's collection efforts altogether pending their appeal of the CCSF Injunction and

2    Money Judgment.

3           86.     Three days later, on January 29, 2018, Beverly Tengco wrote another letter to Plaintiff

4    KIHAGI stating, "**Pursuant to Civil Code §2938(c)(4),** the Bank now hereby demands that the

5    Borrowers pay the Bank all of the Payments now due and that hereafter come due.  **Please contact the**

6    **Bank's** [outside] **counsel, Robert B. Kaplan, Esq**…. to make immediate arrangements to satisfy this

7    demand.  The Bank reserves the right to exercise additional rights and remedies against the Borrowers

8    at law, equity and otherwise, without further notice to the Borrowers, as a result of the occurrence of

9    this Optional Event of Default."

10          87.     This letter was peculiar because it referenced Civil Code §2938(c)(4), which pertains to

11   *nonpayment defaults* and invites borrowers to cure its monetary default by paying the Bank monies

12   owed.  Although KIHAGI was unaware of this at the time, Umpqua Bank was attempting, *in bad faith,*

13   to put XELAN and RENKA into some type of nonmonetary default in order to make it appear the Bank

14   was triggering the Assignment of Rents provision in the Loan Documents.

15          88.     Without actually issuing or recording a proper Notice of Default on any of Plaintiffs'

16   loans, on February 27, 2018, Beverly Tengco of Umpqua Bank wrote another letter to Plaintiff

17   KIHAGI advising her that Umpqua Bank "hereby **accelerates** all outstanding obligations due and

18   owing by XELAN and RENKA to the Bank…and demands immediate repayment of those outstanding

19   obligations on or before March 9, 2018, including without limitation, all unpaid principal, interest (at

20   the Default Rate set forth in the promissory notes), attorneys' fees and costs…"  **And Umpqua Bank**

21   **threatened to get an expensive receiver.**

22          89.     Notably, the above-described letters from secured lender UMPQUA BANK had no legal

23   effect of actually accelerating the Borrowers' loan obligations because they were not Notices of Default

24   as required by foreclosure statutes and per the Bank's loan documents (the power of sale).

25          90.     At no time did Umpqua Bank ever issue or record a Notice of Default accelerating all

26   outstanding obligations due and owing by XELAN and RENKA to Umpqua Bank.  The Bank had no

27   grounds for foreclosure or to enforce its borrowers' debt by a receiver without commencing a proper

28

foreclosure proceeding as to the Bank's security interests in Plaintiffs' properties.  Therefore, Umpqua Bank had no grounds for a receiver under C.C.P. 564.

91.     The next day, on February 28, 2018, <u>the Court granted intervenor Umpqua Bank's motion against Judgment Creditor CCSF for lien priority</u> (hereafter, the "Lien Priority Order").  The Court's Lien Priority Order provided that the Borrowers (XELAN and RENKA included) **are excused from complying with the Assignment Order** to the extent that their Rents were to be paid toward CCSF's money judgment.  <u>Thus, the Bank's Optional Default against its Borrowers XELAN and RENKA was cured.</u>

92.     The Lien Priority Order simply confirmed that Umpqua Bank had a first priority lien (first position deed of trust) and perfected security interests in the Rents of the subject properties and was entitled to them.  <u>After prevailing against Judgment Creditor CCSF on its motion, Umpqua Bank's attorney Kaplan unnecessary drafted the order</u> requiring XELAN's and RENKA's tenants to pay their Rents directly to Robert Kaplan's law firm until January 29, 2018 <u>for no good reason.</u>

93.     Mr. Kaplan's proposed order (that the Court signed) also ordered CCSF to return all the Rents to Umpqua Bank (even though Plaintiffs' loans were current), and ordered all Rents paid by XELAN tenants after January 29, 2018 <u>to be paid directly to Umpqua Bank in Roseburg, Oregon.</u>  This modified transaction was entirely unnecessary because XELAN was never in default on its mortgage payments and Umpqua Bank could continue to draw the mortgage payments directly from Plaintiffs' bank accounts.

94.     At all pertinent times, Umpqua Bank never needed a third-party Rents collector. Furthermore, the "Independent Property Manager" was available for that task (under the above-described five-year CCSF Injunction, the KIHAGI Defendants were required to hire an Independent Property Manager), but Umpqua Bank deliberately chose <u>not</u> to use CCSF's Independent Manager as a Rents collector in order for Mr. Kaplan to unnecessarily stay involved in the <u>CCSF v. Kihagi et al.</u> post-trial activities and bill his client.

95.     On March 21, 2018, Plaintiff KIHAGI dutifully sent XELAN's and RENKA's most recent rent rolls, 2015 and 2016 tax schedules, and XELAN's and RENKA's financial reports for the years 2015, 2016 and 2017 to Umpqua Bank.

96.     After having received XELAN's and RENKA's 2015, 2016 and 2017 financial reports, UMPQUA BANK never informed KIHAGI of any more concerns over those reports, and even if the Tengco letters suggested the Bank was accelerating the loan balance <u>without a Notice of Default</u>, the Bank appeared to have ***reinstated*** its loans by collecting Rents and ACH mortgage payments thereafter.

97.     Notably, <u>both</u> alleged "Optional Defaults" were substantially cured by March 21, 2018 as the alleged default caused by the CCSF judgment liens were **cured** by the Lien Priority Order for purposes of "reinstatement of a nonpayment default" under Civil Code Section 2924c, and Umpqua Bank received XELAN's and RENKA's current rent rolls and satisfactory financial reports on or about March 21, 2018.

## THE ILL-GOTTEN RECEIVERSHIP

98.     Nonetheless, on March 12, 2018, secured lender Umpqua Bank filed two separate, identical lawsuits against Plaintiff XELAN and Plaintiff RENKA both entitled, "Verified Complaint for:  Specific Performance and Appointment of Receiver" and no other causes of action.  A receiver is an ancillary remedy, not a cause of action.  The Complaints failed to state of cause of action for the appointment of a receiver under Code of Civil Procedure Section 564.  The borrowers XELAN and RENKA were not in an actionable loan default.  Notably, secured lender Umpqua Bank never issued or recorded a Notice of Default or commenced foreclosure proceedings as required by law and under the Power of Sale set forth in the aforementioned "Filbert Street Loan Documents" or the "19th Street Loan Documents," or the "Eureka Street Loan Documents."  Nor did Umpqua Bank ever commence an inexpensive nonjudicial foreclosure against Plaintiff XELAN or Plaintiff RENKA.

99.     Instead, Umpqua Bank's Complaints falsely, yet ***vaguely*** suggested in its pleadings that Plaintiff XELAN and Plaintiff RENKA were "seriously in default" on their respective loans and alleged that Umpqua Bank had [somehow] <u>accelerated</u> the Borrowers' loan obligations because of the vaguely described defaults.  The Complaint never mentioned a statutory Notice of Default.

100.     **Umpqua Bank's Complaints alleged no facts meeting the statutory requirements of Code of Civil Procedure §564 for installing a receiver** (to aid the lender by preserving the risky, dangerous or under water property during a foreclosure):  There was no foreclosure pending.  Secured lender Umpqua Bank suggested but did not allege in its Complaints that it was foreclosing on Plaintiff

XELAN and Plaintiff RENKA's securities under the power of sale in its deed of trust, or that Umpqua Bank had recorded a Notice of Default.  Nor did its Complaints describe how the properties were **in danger of being lost, removed, or materially injured**, or that **the properties had insufficient equity to discharge the borrower's debt.**  Nor did the Complaints seek a receiver to sell RENKA's properties or evict its owners residing there.

101.    Yet, the Court could easily presume from Umpqua Bank's misleading complaints filed on March 12, 2018 that Umpqua Bank had actually commenced foreclosure proceedings against its borrowers XELAN and RENKA, and the accelerated loan balances were due and owing.

102.    The two Complaints specifically sought and identified Kevin Singer of Receivership Specialists, Inc. (soon to become Defendants CCSF Receiver on July 29, 2019) to do more than collect Rents per the above-described Priority Lien Order.

103.    ***The day following the filing of the initial Complaints***, on March 13, 2018, Umpqua Bank filed an **Ex Parte** Application For Immediate Appointment of Receiver and Preliminary Injunction in Aid of Receiver ("the Ex Parte Application") as if XELAN's and RENKA's investment properties were distressed, unsafe and a public nuisance *[which they were not]* and in need of an **emergency** receiver.  Umpqua Bank never actually served the summons and complaint or Ex Parte Application upon Plaintiff XELAN, Plaintiff RENKA or Plaintiff KIHAGI.

104.    The **Ex Parte** Application was supported by a Declaration of Beverly Tengo and a Declaration of the proposed receiver, Kevin Singer, but stated no relevant facts or evidence that Umpqua Bank had legal grounds for appointment of a receiver under Code of Civil Procedure §564(b).

105.    The other reason stated in the Ex Parte Applications against Plaintiff XELAN was false, intentionally vague and absent of evidence:  "**Numerous events of default** have occurred under the Bank's loan documents and the Borrower is obligated to the Bank in an amount in excess of $3,342,401..."  **It mentioned nothing about foreclosure proceedings, a Notice of Default, or why XELAN owes the Bank $3,342,401.**

106.    The other reason stated in the **Ex Parte** Applications against RENKA was false, intentionally vague and absent of evidence:  "**Numerous events of default** have occurred under the Bank's loan documents and the Borrower is obligated to the Bank in an amount in excess of

$1,222,815.89...**"  It mentioned nothing about foreclosure proceedings, a Notice of Default, or why RENKA owes the Bank $1,222,815.89.**

107.    The intentional misleading "numerous events of defaults" did not exist.  That is the reason why Umpqua Bank could not and did not ever record a Notice of Default against Plaintiff XELAN's and RENKA's properties.

108.    On April 6, 2018, Umpqua Bank's attorney, Robert Kaplan, crafted an unopposed court order on the Bank's ex parte application giving the receiver the broadest powers and authorities to do ***more than*** just collect rent under the Lien Priority Order.  Mr. Kaplan was able to do so by informing XELAN's and RENKA's then-disinterested attorney, Paul Manasian, that the Receiver was simply being installed to temporarily collect the Rents per the Lien Priority Order until the KIHAGI Defendants' appeal bond was approved.

109.    Umpqua Bank's proposed order, signed by the Court on April 6, 2018, actually allowed the receiver to take possession and control of and manage XELAN's and RENKA's rental properties, collect Rents from XELAN's and RENKA's tenants (while the Bank was also simultaneously electronically drawing ACH payments from XELAN's and RENKA's bank accounts) and issued a temporary restraining order and preliminary and permanent injunctions restraining and enjoining Plaintiffs XELAN, RENKA, and their agents, servants and employees from "interfering" with the new receiver.

110.    At all pertinent times, Umpqua Bank, Defendants CCSF, and the proposed receiver, Kevin Singer (in this context, "UMPQUA Receiver") knew Umpqua Bank had no Assignment of Rents Order because Plaintiffs XELAN and RENKA were never in default on their monthly mortgage payments.  Umpqua Bank and UMPQUA Receiver also knew that the Bank had no grounds for foreclosure of the Bank's security, and it had never commenced a foreclosure action against its borrowers, Plaintiffs XELAN or RENKA.

111.    Plaintiffs are informed and believe and hereby alleged that at all pertinent times, UMPQUA Receiver ***knew*** they were being used in a wrongful manner by the Bank, but at all times, UMPQUA Receiver supported Umpqua Bank's knowingly false pleadings before the Court in order to get the paid receiver position and to charge unnecessary monthly fees to the receivership estate.  From

April 6, 2018 to August 4, 2021, UMPQUA Receiver Singer charged the receivership estate of XELAN and RENKA since 2019 for doing absolutely nothing.

112.    Plaintiffs allege that Kevin Singer and his attorney Alsbrook had a prohibited arrangement with Umpqua Bank's attorney that he would get paid from receivership funds once Kevin Singer took possession and control of Plaintiffs XELAN and RENKA's properties, rents, and assets. The same receivers were simultaneously acting as the CCSF Receiver (and controlling XELAN and RENKA's assets in the CCSF receivership) in the manner described above.

### THE WRONGFUL RECEIVER SALE OF THE FILBERT STREET PROPERTY

113.    After the KIHAGI Defendants obtained their appeal bond, tensions arose between Plaintiff KIHAGI and Umpqua Bank's attorney Kaplan when KIHAGI refused to sign a settlement agreement where KIHAGI would commit to pay the Bank's ***ridiculous, overstated*** attorney's fees and release the Bank and Defendants UMPQUA Receiver from all claims.  At that time, the Bank's attorneys had only prepared <u>one</u> simple motion to get the Priority Lien Order and sent letters to KIHAGI from V.P. Beverly Tengco threatening a receiver.

114.    On May 25, 2018, the Court (Judge Lynn O'Malley Taylor) approved the KIHAGI Defendants' appeal bond and issued an order on June 6, 2018 that CCSF's Assignment of Rents Order was extinguished and referenced the Umpqua Bank receivership.  That should have signaled Kevin Singer to end the receivership that had no purpose.

115.    After its new receivership was in place, on January 18, 2019 (seven months after Judge Taylor's Order of June 6, 2018), UMPQUA Receiver did not end its receivership and stop paying themselves with Plaintiffs' money.  On January 18, 2019 Umpqua Bank (not the court-appointed receiver) brought a Motion For **Order Instructing the Receiver** to Sell Plaintiff XELAN's Filbert Street Property for no lawful reason and with no Notice of Default.  UMPQUA Receiver appeared in Court to approve and support Umpqua Bank's proposal.  Umpqua Bank and Kevin Singer knew the receiver's presence before the Court as the court-appointed receiver in support of Umpqua Bank would have an impact on the Court.

116.    As a result of their collective fraud upon the Court, the Court granted Umpqua Bank's motion for an order instructing the receiver to sell Plaintiff XELAN's Filbert Street property without a

judgment in favor of Umpqua Bank, without a pending nonjudicial foreclosure or judicial foreclosure, and outside foreclosure statutes and even outside of receiver statutes.

117.    Despite the requirements that a receiver, as an appointed Officer of the Court, be a neutral party without influence by third parties, Kevin Singer stood before the Court in support of the Bank's motion as if it had legitimate grounds for foreclosure, over Plaintiffs' objections, even though Kevin Singer *knew* his appointment was a sham and would injure Plaintiffs by wasting the assets in his possession and control.

118.    After Umpqua Bank and Receiver Singer got away with misrepresenting the law and making a better impression upon the Court than the property owners/beneficiaries of the receivership estate, the Court approved the sale of the Filbert Street property by a receiver to enforce Umpqua Bank's secured debt in lieu of Umpqua Bank's strict compliance with foreclosure statutes.

119.    On or about March 15, 2019, UMPQUA Receiver Singer sold the Filbert Street Property over Plaintiff XELAN's objections and legal arguments, and he recorded the grant deed.  Per Umpqua Bank's requests, Receiver Singer kept all the sales proceeds in the receivership estate **to pay Umpqua Bank's attorney's fees, the receiver fees,** commissions, amongst other things.

### THE SALE OF THE 19TH STREET PROPERTY

120.    After successfully defrauding the Court, in April 2019, Umpqua Bank and Receiver Singer duplicated their efforts to sell Plaintiff XELAN's 19th Street Property in the same manner and sketchy procedure using the support of Receiver Singer, who cannot feign ignorance of the facts and the procedures for receiver sales to execute judgments.

121.    In an attempt to save the 19th Street Property from being sold by the UMPQUA Receiver upon another motion by Umpqua Bank, Plaintiff KIHAGI had arranged for another lender to pay off Umpqua Bank's note, funded an escrow account, after requesting a payoff sum from the Bank.

122.    Umpqua Bank (through its aggressive attorney, Robert Kaplan) **refused** to provide the Borrowers the payoff sum in violation of Civil Code §2903 and Code of Civil Procedure §701.680 **after he admitted the Receiver sale was not a foreclosure proceeding under its deed of trust.** Umpqua Bank claimed its law firm's attorneys' fees were part of the payoff and "yet to be determined." Therefore, Plaintiff KIHAGI and her attorney had to "guess" at the amount of the new loan necessary

to pay off the Umpqua Bank note.  Plaintiff KIHAGI arranged to have $1,834,270 available to pay off the Bank's note on the day of the hearing to approve the sale.  She obtained a loan to pay off Umpqua Bank's lien, recorded a new deed of trust and funded an escrow account.  The escrow company wired $1,834,270 directly to Umpqua Bank and thus asserted the borrower's statutory right of redemption.

123.    On April 5, 2019, Xelan recorded a new deed of trust and "encumbered the property" with a new loan of cash to pay off Umpqua Bank's loan (in first position, not a junior lien) and wired sufficient funds to Umpqua Bank to stop the receiver sale of its property before the April 10, 2019 hearing to approve the Receiver Sale.

124.    On the day of the hearing on April 10, 2019, Receiver Singer and Umpqua Bank's attorney Kaplan pressured the Court to approve the immediate sale of Plaintiff XELAN's 19th Street Property because Receiver Singer was already in a conditional contract with a buyer (in a 1031 Tax Exchange) and the Order Appointing the Receiver had given him the power to sell[7].  They also announced to the Court that Plaintiff XELAN was **$29,000 short** in the payoff amount even though XELAN had a statutory right to rely on the Bank's last written payoff demand statement less than 30 days before.

125.    Instead of allowing Plaintiff XELAN to pay $29,000 more to stop the receiver sale, Defendants convinced the Court to approve  the sale of the 19th Street Property by a receiver, and it was sold by UMPQUA Receiver Singer.  The grant deed was recorded on May 13, 2020.

126.    Umpqua Bank and its ill-gotten receiver sought the Court's approval, by fraud upon the Court, to violate the One Form of Action Rule (C.C.P. §726) to sell the borrowers' securities by a receiver.  They assured the Court that it had "broad powers" to order such sales.

127.    On April 22, 2019, Receiver Singer abused his position as a receiver to seek an *ex parte* order for removal of Plaintiff XELAN's new deed of trust ("Lien Stripping Order") that secured a new loan to pay off Umpqua Bank's Note, to stop the sale of its 19th Street property.  In a related Order of October 9, 2019 (after the May 13, 2019 receiver sale), the Court granted Defendants UMPQUA

---

I.        [7] The Court should not have been pressured to ignore applicable statutes, per *Cal-American et al v. Brown (1982) 138 Cal.App.3d 268.*

Receiver's motion to return the new loan proceeds to the lender and refund $100,000 to the buyer as the result of the receiver's errors in failing to timely abate two outstanding Notices of Violation.

128.    At the time, Umpqua Bank and Receiver Singer's attorneys told the Court that the property owner XELAN's assertion of its statutory right of reinstatement and/or redemption <u>violated the Order Appointing the Receiver</u> and its preliminary injunction that barred the owner from "interfering with" the Receiver, and under the Appointment Order, Plaintiff XELAN was "explicitly prohibited from encumbering 19th Street [property]."

129.    **As a result of fraud upon the Court, Plaintiff XELAN was effectively denied its mandatory, statutory right of redemption which is allowed in foreclosure sales and receiver sales for which the Court had no jurisdiction to grant.**

130.    After Plaintiff XELAN asserted its statutory right of redemption and wired sufficient funds to Umpqua Bank, the only thing the Bank could do was record a reconveyance of its deed of trust.  Umpqua Bank could not strip the recorded deed of trust, through a receiver, just because it wanted more attorney's fees than were set forth in its Pay Off Demand Statement.

131.    Umpqua Bank and Receiver Singer certainly could not reject the tender, or make untimely excuses for not accepting the exact sum that the lender had demanded from the borrower in its last Pay Off Demand Statement (ie., the borrower owes more attorney's fees), or condition the right of redemption on the borrower signing a self-serving settlement agreement.

132.    On April 22, 2019, the Court granted UMPQUA Receiver's *Ex Parte* Application for an Order to strip and transfer the new lien from the 19th Street Property to the net sale proceeds.  The Receiver referred to this as a "Lien Stripping Order."

133.    Plaintiff XELAN alleges that UMPQUA Receiver Singer's "Lien Stripping Order" and the Order Approving the Receiver Sale **after the lender acknowledged receipt of the sum demanded in its Pay Off Demand Statement** was void because no such procedure exists in real property law <u>as it effectively denied the debtor its statutory rights of redemption and denied the property owner the Constitutional rights and privileges of ownership.</u>  Furthermore, the Order Instructing the Receiver to sell the 19th Street Property security outside of foreclosure statutes to enforce Umpqua Bank's debt violated the One Form of Action Rule [Civil Code §726], and denied Plaintiff XELAN its

Constitutional rights to due process and its statutory right of redemption under the statutes governing foreclosure sales <u>and</u> receiver sales.

134.    Clearly, Umpqua Bank and its ill-gotten receiver, Singer and CCSF attorneys knew Umpqua Bank had no money judgment against Plaintiff XELAN, no grounds to foreclose on its deed of trust, and no grounds for an appointment of a receiver by statute.  They had "gotten away with" selling innocent, nondefaulting borrowers' properties by misrepresenting the facts and the law to the Court **in lieu of a Notice of Default, a money judgment, a nonjudicial foreclosure, or judicial foreclosure.**

135.    Prior to the receivership and throughout the life of the Umpqua Bank's loans, Plaintiffs/Borrowers XELAN, RENKA and KIHAGI had maintained regularly monthly mortgage payments to Umpqua Bank.

136.    Plaintiffs hereby allege that after observing how Umpqua Bank and Receiver Singer orchestrated a fraud upon the Court with their vague and confusing pleadings, Defendants CCSF, MICHAEL WEISS and PETER KEITH decided to get the same rogue receiver appointed in the CCSF v. Kihagi et al. case after judgment.

137.    Receiver Singer colluded with Umpqua Bank (and other secured lenders, see below) and with Defendants WEISS and KEITH to abuse legal processes, confuse the Court, and get a receiver appointed (under the guise of a property **manager**) to liquidate Plaintiffs' properties despite having no actionable defaults, to avoid California foreclosure procedures that protect borrowers and limit the lender's legal fees and costs by statute.

138.    Clearly, Defendants knew that Plaintiffs gave them no grounds for a nonjudicial or judicial foreclosure, and no statutory grounds for an appointment of a receiver to sell off Plaintiffs' properties.  The Superior Court Judge was newly appointed in the Law & Motion department, and was not well-versed in receivership or foreclosure statutes, and disregarded Plaintiffs' objections and sound legal arguments.  Apparently, the Court was enamored with the Color of the City Attorney's Office (Defendants), Umpqua Bank's downtown law firm, and the Los Angeles-based receiver which supported their actions against the owners of the receivership properties.

**THE WRONGFUL SALE OF RENKA'S EUREKA STREET PROPERTY**

139.    With Superior Court Judge Charles F. Haines seamlessly in their pockets (at the time), on _____, 2019, Umpqua Bank and Receiver Singer again duplicated their efforts to sell Plaintiff RENKA's 195 Eureka Street Property.

140.    Secured lender Umpqua Bank again brought its own Motion For Order **Instructing Receiver Singer** to Sell Plaintiff RENKA's Eureka Street Property, and failed to disclose to the Court how RENKA was not in default on its loan and Umpqua Bank had not commenced foreclosure proceedings.  The Bank's attorney again knowingly misrepresented the law to the Court with Defendants' and CCSF attorneys' approval and support, and relied upon the Court's not reversing himself on his prior acts of approving Umpqua Bank's prior motions.

141.    Plaintiff RENKA objected to the sale on the grounds that the secured creditor's right to enforce its debt secured by a deed of trust is restricted by the foreclosure statutes that Umpqua Bank and Receiver Singer ignored.

142.    Umpqua Bank, with the support of Receiver Singer in court, continued to misrepresent the law to the Court and assured the Court, over Plaintiffs' objections, that the Court had "broad inherent authority" to approve a receiver sale of the Eureka Street Property upon any default asserted by a secured lender.  Again, UMPQUA BANK and Defendant RECEIVER got away with misrepresenting the law, not producing evidence of an actual default by RENKA or evidence of its commencement of any foreclosure proceedings against RENKA by issuing and recording a Notice of Default.

143.    At the behest of Umpqua Bank and its Receiver Singer, the Court approved the sale of the Eureka Street property, as well as issuing an order evicting the beneficiaries of the receivership estate out of the Eureka Street property without unlawful detainer proceedings, so the property could be sold vacant by the ill-gotten Receiver Singer.

144.    On or about May 21, 2019, UMPQUA Receiver Singer sold the Eureka Street Property over Plaintiff RENKA's objections, and recorded the grant deed signed by Singer.  The sale took place after Umpqua Bank, with the support of Singer by his side, misrepresented the applicable law to the Court that 1)  Plaintiff RENKA had to post an expensive appeal bond (not the receiver) even though the appellant was not in possession or control of the subject property, the Superior Court (via the receiver)

were; and even though "the person ordered to sell" was not a judgment creditor.  2)  that the Order allowing the receiver to market and promote Plaintiff RENKA's property for sale was not an appealable order.

145.     Thereafter, Receiver Singer kept the sales proceeds of the 195 Eureka Street property **to pay Umpqua Bank's attorney's fees and his own fees indefinitely,** and other things.

146.     Receiver Singer and his attorney went along with Umpqua Bank's attorney's knowing fraud upon the Superior Court judges.  They knew that Plaintiff RENKA had not defaulted on the Eureka Street Loan Documents, so they could charge, and continued to charge, monthly fees to the receivership estate, and their property management company could earn huge commissions from the sales of Plaintiffs' properties rather than <u>rent</u> the vacant units to generate income.

**HOW SECURED LENDER J.P. MORGAN CHASE BANK'S ATTORNEY AND THE SAME RECEIVER ALSO COMMITTED FRAUD UPON THE COURT TO ENFORCE SECURED DEBTS BY A RECEIVER SALE SO THE LENDER COULD SIMILARLY AVOID HAVING TO COMPLY WITH FORECLOSURE STATUTES THAT PROTECT BORROWERS FROM OVERREACHING LENDERS:**

147.     Secured lender J.P. Morgan Chase Bank observed how secured lender, Umpqua Bank's and UMPQUA/CCSF's Receiver Singer were being influenced by others to destroy Plaintiffs' rental housing business and liquidate their properties through several abuses of process.  Chase's attorney decided to do the same.

148.     Per Defendants' instruction, CCSF Receiver Singer failed to pay Plaintiff NOZARI's property taxes to the City & County of San Francisco.  Even though there were significant equity cushions and the City & County of San Francisco's Tax Assessors' Office offers a payment plan to their citizens to pay any delinquent property taxes in installments, J.P. Morgan Chase's attorney ("Chase") decided to issue and record several defective Notices of Default against Plaintiffs NOZARI and RENKA on the weak grounds that:  1)  the CCSF money judgment encumbered their securities (despite their court-approved appeal bond on May 25, 2018); and 2)  NOZARI's property taxes were due and owing, and the CCSF Receiver was not paying them.

149.     Like secured lender, Umpqua Bank, Chase also entered into a prohibited "arrangement" with Receiver Singer and his attorney, whereby Chase would not *accept* monthly mortgage payments

from the CCSF Receiver on behalf of its borrowers, Plaintiffs NOZARI and RENKA; and the CCSF

Receiver would not *pay* monthly mortgage payments to Chase after its Notices of Default were issued

or make any attempt to "cure" the defaults raised by Chase in its Notices of Default.

150.    At all pertinent times, Defendant CCSF Receiver ignored Plaintiffs' directions to him

and his attorneys to collect the rents from their properties and keep their mortgages current per the

Order of Appointment and CCSF Injunction.  Singer was a rogue "agent/property manager" ignoring

the instructions of his principals and Beneficiaries of the receivership estate in his possession and

control.

151.    Plaintiffs hereby allege that secured lender Chase had any intention of actually

foreclosing on their securities at the Church Street property or the Guerrero Street property, but Chase

wanted to get out of the loan contracts with Plaintiffs by using the CCSF Receiver to its advantage just

as Umpqua Bank did.

152.    Plaintiffs allege that Chase decided to use the rogue CCSF Receiver (wrongfully using

his position as an officer of the court) to recommend and get permission from the Court to sell

receivership properties without Chase having to commit wrongful foreclosure.

153.    On two occasions, Chase used its defective Notices of Default to ***threaten*** Plaintiffs

NOZARI, RENKA and guarantor Plaintiff KIHAGI with nonjudicial foreclosures.  Chase even issued

Notices of Trustee's Sale to Plaintiffs, and then postponed them.  Chase even withdrew two Notices of

Default, and reissued and recorded them over a year's time.

154.    At all pertinent times, Chase's attorney was colluding and timing its conduct with

Defendants CCSF, their receiver Singer and his attorneys to commit another fraud upon the Court.  The

secured lender Chase continued to "stage" its threats of nonjudicial foreclosure sales of Plaintiff

NOZARI's Church Street property and Plaintiff RENKA's Guerrero Street properties in order to 1)

harass and intimidate its borrowers and encourage to find another lender to purchase the Note from

Chase; and 2)  to assist Defendants' Receiver to convince the Court that it would be "in the best

interests of the receivership estate" to allow the receiver to sell Plaintiffs' properties himself than to

allow Chase to foreclose for a lesser price.

155.   Defendants' Receiver Singer and his attorney again assured the Court that they could get a better price if he used his own realtor to sell secured lenders' securities rather than Chase executing its (staged) threat of foreclosure.

156.   At no time did Defendants' Receiver arrange to pay current Chase's loans and Plaintiffs' property taxes with the Rents (and sales proceeds) that he collected.  Nor did Defendants or Receiver Singer's attorneys counsel the CCSF Receiver on any plan to manage and preserve the receivership estate and business **other than self-serving liquidation of the properties by Singer**.

157.   In accordance with Defendants' plan, the CCSF Receiver Singer and his attorneys used Plaintiffs' rental income and the substantial proceeds from the unlawful sales to receivership properties to pay themselves and to others they colluded with.  Monthly mortgage payments, operating expenses and property taxes were not paid from the $25.5 million of sale proceeds.  From the date of the Order of Appointment, Defendants' Receiver did not pay the Beneficiaries of the receivership estate a dime. Instead, Defendants and their Receiver willfully **lied** to the Court that 1)  money is being "reserved" for certain work needed at the properties (that was never done); and 2)  after the sale of over $25.5 million of properties, there is no available money left.  Defendants WEISS and KEITH always joined in CCSF Receiver's pleadings, and opposed Plaintiffs at all the hearings.

158.   Each time the Court granted Defendant CCSF Receiver's motions to sell receivership properties with the approval of Defendants WEISS and KEITH (like an improper execution sale without a judgment), the secured lenders were able to circumvent California foreclosure statutes that had been legislated for decades to protect borrowers from overreaching lenders, and the sanctions upon secured lenders for enforcing their debts by means **other than foreclosure.**

159.   By utilizing another party's property manager/receiver (whom Plaintiffs contend was wrongfully appointed as a receiver two years after final judgment in the CCSF Action) to sell its securities in Plaintiffs NOZARI's and RENKA's properties, secured lender Chase also willfully violated the "One Form of Action Rule" (C.C.P. 726) which mandates that the only form of action by a secured lender to enforce its debt is **foreclosure** in strict compliance with the California statutory scheme.

160.    At all pertinent times, Defendants instructed, directed, supported and applauded their Receiver Singer and his attorneys in court for liquidating Plaintiffs' receivership properties in their possession and control, and outside the Order of Appointment and the CCSF Injunction.

161.    Defendant CCSF, through its deputy city attorneys Defendants WEISS and KEITH, secured lenders Umpqua Bank, J.P Morgan Chase, CCSF Receiver Singer and his attorneys effectively committed unprecedented fraud upon the Court.  Now, they are trying to hide behind the fact that 1) their collective fraud upon the Court caused the Court to bless the ill-gotten receiver's illegal sales of Plaintiffs' properties without a judgment to execute upon, and 2)  both secured lenders fabricated defaults by colluding with Defendants, and enforced its secured debts by receiver sales in violation of the "One Form of Action Rule," without a judicial decree of foreclosure or by a nonjudicial foreclosure.

**HOW SECURED HARD MONEY LENDERS LIU AND THE SAME RECEIVER COMMITTED FRAUD UPON THE COURT SIMILAR TO CHASE, TO ENFORCE SECURED DEBTS BY A RECEIVER SALE SO THE LENDER COULD SIMILARLY AVOID HAVING TO COMPLY WITH FORECLOSURE STATUTES:**

162.    In an effort to finance the $8 million appeal bond to stay enforcement of the CCSF Judgment, Plaintiff and Guarantor KIHAGI desperately fell into the hands of hard money lenders Lin Dee Liu dba Lin Dee Liu Services who operated a loose and informal operation.  After entering into several loan agreements with Lin Dee Liu, Plaintiff KIHAGI learned that Lin Dee Liu's loans were usurious, and she had not provided mandatory, statutory disclosures to the borrowers prior to their being obligated on the loans.

163.    Plaintiff KIHAGI also learned that Lin Dee Liu wore several hats.  She represented herself to KIHAGI as an independent loan broker for undisclosed lenders and she was entitled to commissions.  She also acted as the loan servicer who collected the monthly mortgage payments and paid the lenders.  Later, Plaintiffs discovered that Lin Dee Liu was actually one of the lenders herself and her close relatives were the lenders, and there was one collective loan fund.  Lin Dee Liu and her lender relatives will hereafter be referred to as "the LDL Lenders."

164.    Initially, Plaintiff KIHAGI had a friendly and informal relationship with Lin Dee Liu.  The LDL Lenders loaned Plaintiffs VERPRESAR and CAMIERDA $1.5 million secured by a second position, single deed of trust at 1901 Pacific Avenue and 1012 Page Street.

165.    After Defendants' Receiver took over 11 properties, all of their rents and assets (and had a property management company Vanguard and a law firm at his disposal) on July 29, 2019, the Receiver failed to pay some buildings' property taxes, monthly mortgage payments to secured lenders, and other important operating expenses.

166.    Plaintiffs KIHAGI, VERPRESAR and CAMIERDA commenced a lawsuit in the Superior Court of Los Angeles County against the LDL Lenders seeking an accounting of their loans, and for rescission of their loans, and a court decree that their principal balances of their loans have been paid in full as a result of the LDL Lender's violations of statutes governing loan brokers, usury loans, etc.  The LDL Lenders transferred their case to San Francisco.

167.    The LDL Lenders never sent their borrowers written statements or written notices of late charges, etc.  When they were on friendly terms, Lin Dee Liu sympathized with KIHAGI's loss of access to Plaintiffs' properties and their rental income to the CCSF Receiver.  She created a pattern and practice with Plaintiff KIHAGI (orally modifying written contracts) where she would e-mail KIHAGI and assured her that she did not have to pay the LDL Lenders according to the respective Notes if she was "short on cash."  Lin Dee Liu lowered the loan payments and instructed Plaintiff KIHAGI to make certain payments to certain lenders each month.  The sum was an affordable amount to pay each month, and could have been paid by the receiver from the Rents collected from each property.

168.    Plaintiffs are unaware of the nature of the dealings between the LDL Lenders and Defendants' Receiver Singer at this time, but it appears that in accordance with Defendants' liquidation plan, Singer decided not to make _any_ payments to the LDL Lenders in order to invoke threats of foreclosure so Singer could (again) apply to Court to sell the Liu Lenders' securities just like they did when J.P. Morgan Chase's "staged" threats of foreclosure and Umpqua Bank's vague insinuations of foreclosure to the Court.

169.    Plaintiffs believe that Defendants' Receiver and their attorneys Defendant ALSBROOK/ECJ got into a dispute with hard money lenders, the Liu Lenders, who had security interests in three receivership properties at 69-75 Hill Street, 1901 Pacific Avenue and 1012 Page Street.  According to Defendants' Receiver's court papers, the Liu Lenders and Plaintiff KIHAGI were "thieves," who refused to give the CCSF Receiver any loan information or accounting so the receiver

could not determine who to pay and how much to pay on three loans secured by Plaintiffs ZORIALL's, VERPRESAR's and CAMIERDA's properties.

170.    Instead of easily seeking the Court's assistance to get a proper accounting from the Liu Lenders to determine how much was owed to them (to avoid foreclosure and help Plaintiffs in the Los Angeles litigation), CCSF's Receiver and his attorneys simply refused to make payments to the Liu Lenders.  Nor would they assist Plaintiffs in their lawsuit against the Liu Lenders that could certainly benefit the receivership estate in the end.

171.    Defendants' Receiver also refused to listen to any directions by Plaintiff KIHAGI to pay the Liu Lenders at least what reduced monthly payments they had sought from Plaintiffs in the past, so the Liu Lenders would not attempt to enforce their debt by foreclosure and jeopardize the receivership properties.  That omission by the CCSF Receiver put three receivership properties owned by Plaintiffs VERPRESAR, CAMIERDA, and ZORIALL at risk of foreclosure by the Liu Lenders.

172.    At no time did LDL Lenders provide any written receipt or written accounting to their borrowers showing how the monthly payments were being used or applied to the loan balance, or interest accruing – even after Plaintiffs VERPRESAR and CAMIERDA paid down the principal balance by $500,000 in September 2018 (making the principal $1.5 million.)

173.    After Plaintiff KIHAGI learned they had been abused by the hard money lenders, Plaintiffs' manager requested from Lin Dee Liu written accounting statements of her LLCs' loan.  After the LDL Lenders refused to (or could not) provide Plaintiffs with an accounting of their loans or give Plaintiffs' proper written notices and regular statements for over a year, and LDL Lenders threatened foreclosure, and their relationship naturally soured.

174.    At the same time, LDL Lenders started colluding with Defendants' Receiver and their attorneys.  LDL Lenders had initially refused to cooperate with the CCSF Receiver (after the Receiver also sought an accounting of the subject loans), but later they all decided to liquidate Plaintiffs' properties for their own financial gain.

*175.*    Accordingly, CCSF Receiver Singer failed and refused to make <u>any</u> payments on LDL Lenders' secured loans, and LDL Lenders agreed to "stage" threats of foreclosure

(but not actually foreclose) so the Court could approve another one of Defendants' Receiver's motion to sell Plaintiff VERPRESAR, LLC's 1901 Pacific Avenue Property over Plaintiffs' vehement objections, and with the support of Defendants, during the pending litigation in Los Angeles.

176.   The Court granted CCSF Receiver's motion again in late December 2021.  The receiver's sale quickly took place on January 4, 2022 and enabled LDL Lenders to avoid statutory foreclosure proceedings without a judgment in any action, and without a decree of judicial foreclosure.  Both Defendants' Receiver Singer and LDL Lenders thought they "got away with" unlawfully selling Plaintiff VERPRESAR, LLC's property in the receivership until Plaintiffs again raised the receiver sale to the Court as a violation of the "One Form of Action Rule, C.C.P. §726 for which secured lenders could be sanctioned in the form of loss of security interests in both properties secured by the deed of trust and/or the total loss of the debt.  And the rogue receiver surcharged herein for committing fraud upon the Court.

177.   By the time of the sale of Plaintiff VERPRESAR's property on January 4, 2022, the LDL Lenders never provided an accounting of the subject loan to the receiver or their borrowers.

178.   After LDL Lenders received $1,787,239.00 from the sale of Plaintiff VERPRESAR's 1901 Pacific Avenue property, they tried to use <u>the same receiver, Kevin Singer</u> to sell their second security (under the same deed of trust) at 1012 Page Street (owned by Plaintiff CAMIERDA) under another staged threat of another foreclosure.  The foreclosure was based on a Notice of Default that had been recorded back on March 30, 2020.

179.   After Plaintiffs objected to the sale and raised C.C.P. 726 again, **the Court denied the receiver's motion to sell CAMIERDA's property on April 12, 2022.**  Plaintiffs contend that 1)  LDL Lenders lost their lien on the 1012 Page Street property altogether by the unlawful receivership sale that violated Section 726, and 2)  their accounting was severely defective, unsupported by law, and could not support a nonjudicial foreclosure.

180.   Not to be deterred, LDL Lenders scheduled a nonjudicial foreclosure sale based on their old defective Notice of Default, and a hearing on Plaintiffs' OSC re:  Preliminary

Injunction is scheduled for August 19, 2022.

**FIRST CAUSE OF ACTION**
**WASTE OF RECEIVERSHIP ESTATE PROPERTIES AND FUNDS**

181.    Plaintiffs allege that Defendants, through the receiver they installed to take possession of Plaintiffs' properties, rents and assets, and for which Plaintiffs received no benefits and only injuries, fell below the standard of care of government prosecutors.

182.    a Rents and Profits receiver appointed by Umpqua Bank and CCSF to "preserve" the receivership estate and to manage the receivership rental housing business with good business sense. Defendant RECEIVER failed to report to the Court -----Plaintiffs further allege that Defendant RECEIVER failed to diligently rent (and deliberately failed to rent) vacant apartments, failed to (and deliberately failed to) generate rental income, failed to pay Plaintiffs' property taxes, failed to terminate nonpaying tenancies to generate rental income, failed make timely repairs and finish renovations of vacant apartments, failed pay bills to the San Francisco Building Inspection Department to abate building code violations.

183.    Plaintiffs further allege that Defendant RECEIVER willfully breached his duties to *preserve* the receivership properties per its Order of Appointment and to manage them in a business-like manner.  Defendant RECEIVER deliberately left apartments vacant because he was influenced by and colluded with Plaintiffs' secured lenders Umpqua Bank, J.P. Morgan Chase Bank to sell off receivership properties outside of (and to avoid) foreclosure statutes that give borrowers rights of redemption and limit attorneys fees by statute.  Defendant RECEIVER was a knowing instrument unlawfully used by secured lenders in willful violation of the One Form of Action Rule codified in C.C.P. 726 and decisional law.  Vacant building sell at higher prices than tenant occupied properties and yield higher commission to Defendant RECEIVER and their attorneys and realtors.

184.    As a direct and proximate result of Defendant RECEIVER's breach of his duties as a neutral officer of the court, the collusion with secured lenders, their professional negligence, unfair, wrongful and fraudulent business practices, Plaintiffs have been harmed in an amount to be proven at trial, but not less than $50,000,000.

**FIRST CAUSE OF ACTION**

**(WASTE OF RECEIVERSHIP PROPERTIES AND ASSETS)**

185.    Plaintiffs hereby allege and incorporate herein by reference, all paragraphs contained in this complaint as if the same were fully set forth at length herein.

**SECOND CAUSE OF ACTION**
**WRONGFUL FORECLOSURE (CIVIL CODE 2924)**

110.    Plaintiffs hereby allege and incorporate herein by reference, all paragraphs contained in this complaint as if the same were fully set forth at length herein.

110.    Defendant RECEIVER wrongfully attempted to foreclose on Plaintiffs' Church Street Property through an unlawful receiver sale without valid grounds, in an attempt to intimidate and harass Plaintiffs at the behest of CCSF.

111.    At all pertinent times, Plaintiffs have not materially defaulted on their loan obligations and the secured lenders' securities were never been impaired.

112.    Defendant RECEIVER refused to accept the payments from Chase and refused to make payments to LDL Lenders.  There was, thus, no actionable default in mortgage payments, other than the cessation of payment created by RECEIVER's refusal to accept the monies from Chase via ACH payments, and Defendant RECEIVER's refusal to make any payments to hard money LDL Lenders.

113.    As the result of Plaintiffs' available payments to their secured lenders, that Defendant RECEIVER refused to execute, the defaults on the secured loans were willfully created by Defendant RECEIVER in bad faith.  Accordingly, the secured lenders waived any right to assert that the loan was in default when it refused the receiver payments, or colluded with Defendant RECEIVER to get court approval to sell their securities.  As a result, the secured lenders should not be able to avoid sanctions for willfully violating the "One Form of Action" Rule to enforce their debts secured by real property. They breached their loan contracts by enforcing the secured debts outside of statutory foreclosure proceedings, and Defendant RECEIVER and those secured lenders may not benefit from their wrongful conduct and breaches of the parties' Note and deeds of trust.

It would be irreconcilable that Defendant RECEIVER was creating its own default and should not benefit from that.  By colluding with three sets of secured lenders to achieve CCSF's goals of

liquidating Plaintiffs' properties and rental housing businesses in San Francisco by a rogue fiduciary, Defendant RECEIVER is not immune from claims by the beneficiaries of the receivership estate.

WHEREFORE, Plaintiffs pray for judgment as herein set forth.

## THIRD CAUSE OF ACTION
### (BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING)

Plaintiffs hereby allege and incorporate herein by reference, all paragraphs contained in this complaint as if the same were fully set forth at length herein.

114.    Plaintiffs reasonably reposed trust and confidence in Defendant RECEIVER to manage their thriving business and maintain their lender-borrower relationship with their lenders in a reasonable and just manner.  Prior to the CCSF Action, Plaintiffs were in good standing with all three sets of secured lenders, paid them on time and without incident.

115.    Plaintiffs hereby allege that Defendant RECEIVER breached their fiduciary duties to the beneficiaries of the receivership estate in their possession and control, and their ethical duties as officers of the court.

116.    At all pertinent times, Defendant RECEIVER and their attorneys knew of the deputy City Attorneys' agenda to drive Plaintiff KIHAGI out of the rental housing business in San Francisco after the CCSF Action.  Defendant RECEIVER knew CCSF was trying to achieve it through the improper use of a receiver entering into Plaintiffs' businesses as an "Independent" Property Manager that they could influence and control.

103.    At all times, Defendant RECEIVER was a fiduciary with statutory and professional duties to the beneficiaries of the receivership estate.  It had a statutory and legal duty to treat Plaintiffs/Borrowers and their securities with the utmost care, and not impede their performance under the loan documents.  The secured lenders had a contractual duty to act in good faith in dealing with its borrower and the borrower's collateral securing their loans.

104.  Defendant RECEIVER breached their statutory and fiduciary duties by allowing themselves to be influenced by the City Attorney's political agenda, and the secured lenders' agenda to enforce their secured debts by using a receiver to sell their securities, over the borrowers' objections, and acting as the borrower without the actual borrower's consent.  Defendant RECEIVER willlfully

turned against the actual borrower by deliberately using Plaintiffs' money for personal gain, and not paying mortgage payments, property taxes, and other important operating expenses, and by colluding with secured lenders' and tenants' attorneys to effect sales of receivership properties by staging fake "imminent threats" of foreclosure to avoid actually foreclosing on defective Notice(s) of Default.  In Umpqua Bank's case, there was no Notice of Default even issued or recorded.

105.    Defendants RECEIVER breached its fiduciary duties to the beneficiaries of the receivership estate by the above-described reprehensible conduct.

WHEREFORE, Plaintiffs pray for judgment as herein set forth.

**FOURTH CAUSE OF ACTION**
**(NEGLIGENCE; NEGLIGENCE PER SE)**

107.    Plaintiffs hereby allege and incorporate herein by reference, the foregoing paragraphs 1 through 119 as if the same were fully set forth at length herein.

108.    Plaintiffs allege that as a secured lender with an unimpaired security in NOZARI 2, LLC's Church Street property, Defendant RECEIVER had a legal duty to its borrowers to comply with the terms of its loan documents, including the promissory note and deed of trust entered into with Plaintiffs NOZARI and KIHAGI, banking and lending laws, and comply with the covenant of good faith and fair dealing with its borrowers.

109.    Defendant RECEIVER's above-described conduct in refusing to accept monthly mortgage payments from Plaintiffs while having no actionable default against them, and/or with no actual intent to foreclose on their security, and by recording three Notices of Default to scare and intimidate Plaintiffs to pay default interest and excessive attorney's fees as conditions of reinstatement, and colluding with another's Receiver to use RECEIVER's threat of foreclosure to misrepresent to the Court the basis for a Receiver Sale – to cause a sale of RECEIVER's security to avoid foreclosure statutes and the "one form of action" rule – thus violating applicable foreclosure and receiver sales statutes – fall well below the standard of care of secured lenders and banking institutions.

110.    Plaintiffs further allege that RECEIVER fell below the standard of care by denying its borrowers their rights under their deed of trust by deliberately creating an unnecessary nonpayment

default and colluding with another's receiver to liquidate a receivership property, and by doing so, trying to capitalize on the deficit created by its refusal to accept mortgage payments.

111.    Defendant RECEIVER has thus, interfered with and blocked Plaintiffs' ability to maintain its good credit and borrower status, and refinance the RECEIVER debt if they wanted to.

112.    Defendant RECEIVER has failed and refused to negotiate in good faith when its security in the Church Street property was never impaired and has over $3.3 million in equity. Defendant RECEIVER knew the Borrowers had a sufficient appeal bond to appease the Bank's concerns over the CCSF judgment lien, and sufficient Rents to pay any tax delinquencies in installment payments.

113.    Defendant RECEIVER was also well aware of the rogue Receiver and the San Francisco City Attorneys' plan to destroy Plaintiffs' once-thriving rental housing business by abusing legal processes to sell off Plaintiff KIHAGI's well maintained and renovated apartment buildings to achieve CCSF's political goals.

114.  Defendant RECEIVER has failed to provide Plaintiffs a statutory compliant pay-off demands, for no good reason.

115.    Defendant RECEIVER has improperly induced, and/or colluded with, and utilized Umpqua Bank and CCSF's receiver to try and sell off Plaintiffs' property at a below market price, over Plaintiffs/Owners' objections, without complying with the terms of RECEIVER's deed of trust, including Section 8.17(d)(i) of the NOZARI deed of trust, requiring RECEIVER to comply with California's statutory real property and foreclosure laws.

116.    Defendant RECEIVER is deliberately allowing, and doing nothing to stop, Umpqua Bank and CCSF's ill-gotten receiver to wrongfully sell Plaintiffs' property (the Bank's security) by use of RECEIVER's third Notice of Default and related Notice of Sale knowing that the Receiver is not complying with California's judicial and nonjudicial foreclosure laws, and selling the property at a below market price, to its borrowers' detriment.

117.  Plaintiffs performed all conditions and covenants except those that were waived or excused or are unenforceable by Defendant RECEIVER.  Plaintiffs allege that Defendant RECEIVER is allowing the receiver's sale in retaliation for Plaintiff KIHAGI's assertion of her legal rights after

she recognized the unenforceable provisions that Defendant RECEIVER set forth in the Forbearance Agreement.

118.     As a direct and proximate result of Defendant RECEIVER's breaches of the deed of trust and related lawful obligations to its borrowers, Plaintiffs have been harmed in an amount to be proven at trial, but not less than $10,000,000.  As a result of Defendant RECEIVER's breaches of the deed of trust alleged herein, Plaintiffs had to bring this action in Los Angeles County, and defend and bring numerous actions against others, and for which, they are entitled to recover their attorney's fees and expenses in those actions against Defendant RECEIVER.  In the event the Receiver's improper sale is consummated to Plaintiffs' detriment, Plaintiffs will seek compensation from Defendant RECEIVER for all attendant damages according to proof.

WHEREFORE, Plaintiffs pray for judgment as herein set forth.

## EIGHTH CAUSE OF ACTION
### DECLARATORY RELIEF

137.     Plaintiffs hereby allege and incorporate herein by reference, the foregoing paragraphs 1 through 149 as if the same were fully set forth at length herein.

138.     Plaintiffs contend that NOZARI has a right to redemption on the loans prior to sale of their property pursuant to California Civil Code §2903 and other applicable laws.  Plaintiffs further contend that Defendants have a legal obligation to provide Plaintiffs an opportunity to pay off the NOZARI Note in full and/or reinstate the NOZARI Note by making requisite payments and/or taking some other action prior to sale of the Church Street Property.  Moreover, Plaintiffs contend that they are and were entitled to a legally compliant pay-off demand statement.  Plaintiffs further contend that Defendants can only sell the properties pursuant to the judicial and nonjudicial foreclosure procedures provided by applicable law and that Defendant RECEIVER's failure to stop the Receiver from selling its security, and using its Notice of Default to seek court approval for the sale is an unlawful practice to avoid statutory schemes designed to protect borrowers from foreclosure.

139.     Therefore, an actual and justiciable controversy exists between Plaintiffs and Defendant RECEIVER regarding Plaintiffs' rights under the subject deed of trust and Forbearance Agreement, and under California's judicial and nonjudicial foreclosure and receivership statutes.

140.     Plaintiffs seek a judicial declaration from the Court that Defendant RECEIVER's actions to initiate, support and assist another's receiver to accomplish a quasi-foreclosure sale of Plaintiff's Church Street Property, which secured RECEIVER's deed of trust is a violation of the "one form of action" rule, and that Plaintiffs are entitled to a right of redemption pursuant to California Civil Code §2903 and other applicable laws.

141.     Plaintiffs seek a judicial declaration from the Court that Defendant RECEIVER and the Receiver are barred from keeping Plaintiffs' apartments vacant, unrented, and incapable of generating rental income to cure the nonpayment defaults created by Defendant RECEIVER and the receiver. Defendant RECEIVER should resume acceptance of mortgage payments by Plaintiff NOZARI and its installment payment plan to the San Francisco Tax Collector, and add its rejected mortgage payments to the existing loan with consequences or default interest charged to the Borrowers.

WHEREFORE, Plaintiffs pray for judgment as herein set forth.

## NINTH CAUSE OF ACTION
### Unfair Business Practices; Unfair Competition
### (Violation of California Business and Professions Code Section 17200 et seq.)

142.     Plaintiffs hereby allege and incorporate herein by reference, the foregoing paragraphs 1 through 154 as if the same were fully set forth at length herein.

143.     Plaintiffs are informed and believe and thereon allege that Defendant RECEIVER is a lender that take security interests in the real property of its borrowers, who are members of the public at large, to secure the borrowers' performances under RECEIVER's written promissory note and deed of trust of which the borrowers cannot negotiate the terms thereof.  Plaintiffs, in bringing this cause of action, acts as injured members of the general public and on behalf of the public at large, including other present and future borrowers from RECEIVER.

144.    On information and belief, Defendant RECEIVER, through its agents, employees, and representatives, violated California Business & Professions Code §17200, et seq. by the above-described acts and omissions.

145.    Plaintiffs allege that Defendant RECEIVER recorded and used defective Notices of Default in bad faith with no intent to allow its borrowers to cure the alleged defaults.

The three Notices of Default were used by Defendant RECEIVER to harass and intimidate its borrowers so they would get out of the contractual, lending relationship with RECEIVER and find another lender.

146.    Plaintiffs allege that Defendant RECEIVER willfully violated Civil Code §2924c by demanding excessive amounts of money from Plaintiffs to reinstate the loan only to record a third Notice of Default on December 19, 2019 a few months later.

147.    Plaintiffs allege that Defendant RECEIVER's proposed Forbearance Agreement was orchestrated to deny Plaintiffs' rights under their deed of trust and under California foreclosure statutes and was an unlawful "set up" for the Receiver to sell RECEIVER's security without statutory foreclosures proceedings and to deny Plaintiffs' rights of redemption under Civil Code §2903 and the protections of Civil Code §2924c.

148.    By reason of Defendant RECEIVER's fraudulent, deceptive, unfair, unlawful, and other wrongful conduct as herein alleged, RECEIVER has violated California Business and Professions Code section 17200, et seq., by utilizing the above-described acts and omissions, that were deliberately designed to deprive Plaintiffs of their ownership interests in the Church Street Property and the Rents generated by, and could be generated by the Church Street Property in the future.

149.    By reason of the foregoing, Plaintiffs are entitled to civil penalties pursuant to Business and Professions Code section 17206, and restitution of any and all monies and fees unlawfully paid to Defendant RECEIVER by Plaintiffs an amount according to proof, and an injunction enjoining such unfair business practices in the future.

150.    Furthermore, Plaintiffs and other borrowers and victims of Defendant RECEIVER's unfair business practices have no adequate remedy at law, and would require a continuing multiplicity of suits to force Defendant to disgorge its ill-gotten gains.  Defendant RECEIVER has been unjustly

1  enriched by their violations of Section 17200, et seq. of the Business & Professions Code, which

2  thereby justifies the imposition of a constructive trust thereon, penalties imposed by statutes, and

3  damages as may be allows by law.

4        WHEREFORE, Plaintiffs pray for judgment as herein set forth.

5  **<u>PRAYER FOR RELIEF</u>**

6        WHEREFORE, Plaintiffs pray for judgment against Defendants, and each of them, for

7  each cause of action, as follows:

8      1.    For general compensatory damages according to proof, all in a sum to be determined at

9  time of trial;

10      2.    For special damages according to proof, all in a sum to be determined at time of trial;

11      3.    That Defendant RECEIVER, its successors, agents, representatives, employees, assigns

12  and all persons who act in concert with Defendant be permanently enjoined from making any efforts to

13  foreclose on or sell Plaintiffs' properties in the manner proven herein;

14      4.    That Defendant RECEIVER, its successors, agents, representatives, employees, assigns

15  and all persons who act in concert with Defendant be barred and enjoined from the unfair business

16  practices alleged herein;

17      5.    For a constructive trust upon Defendant RECEIVER's ill-gotten gains and unjust

18  enrichment by its violations of Section 17200, et seq. of the Business & Professions Code, and

19  penalties imposed by applicable statutes;

20      6.    That Defendant RECEIVER, its successors, agents, representatives, employees, assigns

21  and all persons who act in concert with Defendant be enjoined absent substantial bona fide uncurable

22  defaults from taking any action against Plaintiffs or their properties;

23      7.    For other economic and consequential damages according to proof, all in a sum to be

24  determined at trial;

25      8.    For damages as permitted under California Code of Civil Procedure Section 726;

26      9.    For damages arising under Code of Civil Procedure Section 701.680;

27      10.    For Declaratory Relief;

28      11.    For Injunctive Relief;

12.    For a Preliminary Injunction;

13.    For punitive or exemplary damages;

14.    For prejudgment interest;

15.    For reasonable attorneys' fees per contract and applicable statutes;

16.    For costs of suit; and

17.    For such other relief as may be appropriate.

Dated:  July 29, 2022

By _____
KAREN Y. UCHIYAMA, ESQ.
Attorney for Plaintiffs XELAN PROP 1, LLC,
RENKA PROP, LLC, NOZARI 2, LLC, ZORIALL, LLC
VERPRESAR, LLC, CAMIERDA 1, LLC, JAMBAX 2,
LLC, KATOKA 5, LLC, ANNE KIHAGI

COMPLAINT FOR DAMAGES AND OTHER RELIEF